[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of a 19 year marriage brought by the plaintiff wife, Diane Fredette Kempf, against the defendant husband, John Kempf, Jr.
The parties were married in June of 1973 in Norwalk, CT Page 10951 Connecticut when the plaintiff was 16 and the defendant 18 years old. The plaintiff had dropped out of school at the tenth grade in December of 1972 and married the defendant in June after having become pregnant by him for the second time. She had terminated the first pregnancy the year before when she was 15. The defendant graduated from high school in June, 1972.
There were two children of this marriage, one John P. Kempf, III, has already reached majority having been born on December 23, 1973, and the other son, Jason R. Kempf, is still a minor born March 2d 1976. No other children have been born to the plaintiff since the date of the marriage.
The plaintiff has lived in the state of Connecticut for at least one year prior to the institution of this action. either party has been the recipient of financial assistance from any government agency. The marriage has broken down irretrievably with no hope of reconciliation, and it is hereby dissolved.
The parties have stipulated that they will have joint legal custody of Jason and that Jason will live with the defendant. Should Jason return to live with the plaintiff, she would have the right to seek support from the defendant. The defendant is not seeking support from the plaintiff. See stipulation on file.
The court reviewed the stipulation, canvassed the parties, listened to the recommendations of counsel for the child and found the agreement to be in the best interest of the child and fair and reasonable under the circumstances, one of which was the desire of the minor child, Jason, to live with his father.
While there seems to be agreement that the assets of the parties shall be equitably distributed, there is no agreement as to how or even as to the total value of the marital estate. Much of the evidence detailed the problems of the marriage, the plaintiff claiming the defendant spent very little time with her, denigrated her, found fault with her homemaking, drank too much and hit her once and had affairs with other women. The defendant claimed that the plaintiff was unresponsive to his needs and spent money carelessly.
The court finds that the problem was one of total CT Page 10952 incompatibility.
The defendant was and is a hard worker. Early in the marriage he apprenticed at Artic Air [Arctic Air], a refrigeration business in which his father was a partner, and he also worked part time at his uncle's automobile repair business. Later he and his father set up a partnership, which is their present business, in refrigeration and air conditioning. In that business, too, he put in long hours although the testimony indicated he came home some times at 3:00 and 4:00 in the morning which would seem to be less likely to be the result of working.
In addition, the defendant spent many weekends and other spare time racing stock cars with each of his sons. He also coached baseball and other sports in which his sons engaged. Given all of these activities, it is clear that he was not home much, and the plaintiff's complaint in this respect is valid.
The plaintiff, on the other hand, had no interest in the stock car racing, did not approve of it for seven or eight year old boys, the age at which the defendant started his sons, and apparently had little interest in the other sports activities in which the defendant and the two boys engaged. She was described as somewhat remote in her interaction with friends of the defendant. It would appear that her interest lay in the maintenance and design of the home and the daily care of the two children and of her husband when he was home. She appears to have developed no other interests nor did she attempt to complete her education once both boys were in school full time.
No doubt the plaintiff's own lack of interest in the defendant's enthusiasms and his absence contributed to her depression which in turn, in effect, seems to have prevented her from taking any steps to improve her own self image. She now says she wishes to complete her education and obtain training in interior design.
The defendant, in contrast, appears to have been an excessively active person, both a hardworker and an energetic participant in his hobbies and athletic activities. He also on occasion drank to excess and had a couple of accidents which appear to have been the result of his drinking.
It also seems that the more financially successful the CT Page 10953 defendant became the more the marriage deteriorated. The best year, for example, for the defendant's business was 1991 and this action was begun in February of that year.
Nevertheless, it is clear that the plaintiff had a good deal of freedom in her marriage, having control of the finances and the ability to spend almost as much as she wanted to despite her husband's objections. This is not a case where the defendant exercised monetary control as well as emotional control.
It appears to the court that the differences in the parties' personalities contributed to the failure of the marriage and that, therefore, neither can be held totally responsible for this. Consequently, the court will not allot blame and will consider this a no fault divorce.
Given that finding, the parties are entitled to an equitable distribution of the marital assets under the guidelines of Connecticut General Statutes 46b-81 and 46b-82. While the plaintiff made no contribution to the defendant's business, she did maintain and decorate the home and provide the day-to-day care of the two sons as well as her husband when he was there. She presently has no skills, not even a GED, and has had only a few months' work experience at the beginning of the marriage.
The defendant, on the other hand, has a flourishing business which appears to gross $2,000,000.00 a year normally with a total gross in 1991, an unusual year, of over $7,000,000.00.
Since 1990, the defendant's income has been a minimum of $100,000.00 a year, in the area of $150,000.00 in 1991, and somewhat over $100,000.00, including bonuses, as a general rule. In addition, he has been the beneficiary of personal needs being supplied by the company including car expenses, the purchase of appliances, snow mobiles, etc. These amounts are rather difficult to calculate but it is apparent that the defendant's income, which does depend on the gross sales of the company, includes much more than the amount of cash which he receives.
In the defendant's affidavit, his weekly income is listed as $1,600.00 as of June 16, 1992 with an additional $174.40 as rent but with deductions for taxes reducing the total CT Page 10954 to $1,175.32. This would appear to be a minimum statement of his income.
The plaintiff is earning $100.00 a week doing housecleaning.
To divide the assets equitably, it is necessary to arrive at value. There seems to be agreement on all but two of the assets, the defendant's business and the timeshare units in Aruba. The other assets appear to be valued as follows:
1. marital home — $185,000.00
2. Evergreen townhouse in Warrenton, New York — $26,198.00
3. Cedar Street, Norwalk — $26,313.00
4. Phoenix Life Insurance — $6,766.00
5. present value of the pension fund — $27,000.00
totalling $271,277.00.
The Cedar Street property includes the building housing the defendant's business and two rental apartments. The defendant and his father receive the rent for the apartments and appropriate it to their own uses. The New York property is owned jointly with the defendant's father through K K Associates and the value is the amount of the parties' interest. The marital home is in joint names and the figure is the estimated equity after deducting the outstanding mortgage.
In addition to the company business, the defendant and his father also have a joint venture called K K Associates which is designated as a real estate holding company and has the function of providing for the ownership of the Cedar Street building for which the defendant's company pays rent of some $48,000.00. Part of that is then used to buy a union pension which the holding company has no basis for doing since it has no earned income. Mr. Axelrod also thought it would not be approved by the IRS because it is discriminatory in favor of the officers.
The Aruba timeshare was valued by the plaintiff at $12,000.00 in her September, 1992 affidavit, by the defendant at CT Page 10955 $11,000.00 in his June 16, 1992 and by the defendant in his claims for relief at $18,000.00. The court will fix an arbitrary value given these valuations at $12,000.00 for the two units.
It is in the determination of the value of the defendant's business share that the parties are in total disagreement.
Four accountants testified. Three called by the defendant and one called by the plaintiff. The plaintiff's accountant, Mr. Axelrod, valued the defendant's business at $1,400,000.00 plus the total fixed assets. Thus the defendant's share under that evaluation would be $700,000.00 plus half of the fixed assets.
The defendant's accountants were closer together as follows:
Mr. Flynn, the company's tax accountant, $208,963.00;
Mr. Zolan, $286,000.00; and,
Mr. Klein, $333,225.00.
None of the defendant's accountants made any reference to the fixed assets.
Each of the accountants was competently and exhaustively cross-examined to the extent that doubts were raised about all their figures. The evidence had demonstrated that the defendant's company had manipulated funds to conceal work done for the partners personally as well as a questionable union pension, payment for personal items like appliances and snow mobiles, payment of car expenses and the like. Yet all the accountants called by the defendant made their valuations on the basis of the figures given them by the defendant without any attempt to audit them or question their validity. They also all made disclaimers that this was the basis for their evaluations.
Only the plaintiff's accountant did an audit but he failed to consult management at all to determine if some of his estimates of personal expenses and the like could be confirmed. He also failed to include the tax consequences of his adding income to the gross income of the company in his computations. CT Page 10956
While he might have received some benefit from consulting with management, given the kind of fiscal manipulation in which the defendant and his father had engaged, there would seem to be little reason for expecting a different result had there been consultation. In addition, questions were raised about the percentage used by Mr. Axelrod to estimate the value of the good will in the defendant's business. The court believes this is too problematical an issue upon which to base any decrease in Mr. Axelrod's figures.
Another problem with Mr. Axelrod's evaluation is his using 1991 as a typical year which the evidence indicated it was not. While this would also decrease his total evaluation to some extent, the success of the defendant's business depends not only on the expertise of the partners but also on their willingness to engage in general contracting as they did in 1991. At the least that year indicated an earning capacity which could well be successfully achieved should the partners decide to engage in that kind of business. Consequently, it should not decrease Mr. Axelrod's total figures.
However, the testimony of Mr. Flynn, the company's tax lawyer who analyzed the tax consequences of Mr. Axelrod's added income figures was impressive. By Mr. Flynn's computation the amount by which Mr. Axelrod's evaluation would be reduced had the tax consequences been included was some $400,000.00. This makes Mr. Axelrod's total $1,000,000.00 plus the fixed assets. The fixed assets appear on a statement of assets, liability and stockholders' equity prepared by Mr. Flynn for December 31, 1991 (exhibit O). In that statement total fixed assets are valued at $201,712.10. The defendant's interest in that would be $100,000.00 and his interest in the total value given by Mr. Axelrod after Mr. Flynn's reduction for taxes would be $500,000.00 making the defendant's total share $600,000.00, and the court so finds.
The total of all the assets appear to be as follows:
1. Marital home — $185,000.00;
2. Aruba timeshare — $12,000.00;
3. Evergreen townhouses at Warrensburg, N.Y. — $26,198.00; CT Page 10957
4. K K Associates — $26,313.00;
5. Defendant's pension, present value $27,000.00;
6. Phoenix Life Insurance policy — $6,766.00 for a total of $283,277.00. When to this is added the defendant's share in his business of $600,000.00, the total marital estate is $883,277.00. The plaintiff's share would be $441,638.00.
The plaintiff has asked that her share of the marital estate include the marital home, the timeshares in Aruba as well as the pension plan and the Phoenix insurance. The court believes that the pension plan, the insurance and the marital home should go to the plaintiff plus one of the timeshare units in Aruba, one to be chosen by the plaintiff. These items total $224,766.00 leaving a balance of $216,872.00 representing her share in the marital estate. The court will order this balance paid over a period of time as set forth in the following orders.
On the question of alimony, the problem is the manipulation of figures in the defendant's business. The minimum his income appears to be is what his affidavit represents of a net of $1,175.32. To that should be added the various items which are personal and which are paid for by the company like car expenses, appliances, snow mobiles, work on his home, etc. This provides the court with a somewhat amorphous total figure. Because of this problem with the accuracy of the figures given and also because the earning capacity of the defendant may very well be measured by his earnings in 1991 when the company had an exceedingly good year because they took on work as a general contractor it would be appropriate to use that since their ability to do that depends entirely on their willingness to do it.
Consequently, the court feels that applying the guidelines would not be appropriate in this case given this total financial situation of both parties. Moreover, it is clear that the defendant has the ability to acquire both further income and future assets, almost at will, depending only to a slight extent on the health of the economy since the best year the company was in one of the worst years of the country's economy.
The plaintiff, on the other hand, may increase her earnings marginally by working full time at housecleaning. This CT Page 10958 would prevent her from completing her education without a long term program and would thus be, in the court's opinion, counter productive. Moreover, once having completed the course she wishes to pursue in interior design, the extent of her earnings thereafter are certainly questionable. It cannot be assumed that after five years she will be self-sufficient in any wage level commensurate with either a third or a half of the defendant's earnings.
Having considered all of the factors set forth in Connecticut General Statutes 46b-81 and 46b-82, the court makes the following orders:
1. The marriage between the parties has broken down irretrievably with no hope of reconciliation and it is hereby dissolved.
2. In accordance with the stipulation entered into by the parties and placed on file with and approved by the court, the parties shall share joint legal custody of the minor child Jason, and Jason's primary residence shall be with his father. The plaintiff shall have liberal, reasonable and flexible visitation. The defendant shall provide for Jason's total support. All of the other provisions of the stipulation are hereby made orders of the court.
3. The defendant shall pay to the plaintiff the sum of $500.00 per week for ten (10) years or until her remarriage, cohabitation within the meaning of the statute or death. This shall be nonmodifiable downward so long as the plaintiff earns less than $25,000.00 a year. After the ten years, the plaintiff shall receive $1.00 a year until her death, remarriage or cohabitation within the meaning of the statute.
4. The defendant shall designate the plaintiff as beneficiary of $150,000.00 of his $250,000.00 life insurance policy so long as he has the duty to support her.
5. The defendant shall transfer to the plaintiff all his right, title and interest in the following marital assets:
 a. the marital home with the mortgage and utilities paid by the defendant to the date of transfer; CT Page 10959
 b. one of the Aruba timeshare units, to be selected by the plaintiff;
c. the present value of his pension of $27,000.00;
 d. the Phoenix Life Insurance policy with a cash value of $6,766.00.
6. The plaintiff shall be responsible for paying the mortgage and utilities and all of the expenses of maintaining the home from the date of transfer, and she shall hold the defendant harmless from any liability for those expenses from that date.
7. As a further distribution of the parties' marital assets, the defendant shall pay to the plaintiff the sum of $191,872.00 payable as follows:
a. $20,000.00 a year for two (2) years;
 b. $15,000.00 a year for ten (10) years with the last payment to be in the total amount of $15,872.00.
Payments are to be made as follows:
 aa. the first within three (3) months of the date of filing of this decision in the amount of $10,000.00;
 bb. the second payment in the amount of $5,000.00 three (3) months thereafter;
 cc. the last payment of $5,000.00 six (6) months thereafter.
 This schedule shall pertain to the first two years only. Thereafter, $15,000.00 a year shall be paid in two installments of $7,500.00 each on January 1st and June 1st of each year until the total is paid in full. All these payments are a distribution of the parties' assets and are not to be considered alimony.
8. The defendant shall retain ownership of his interest in J. F. Kempf Company business and in K K Associates and in the townhouses in Warrensburg, New York, and in all of the other assets not heretofore transferred by the orders CT Page 10960 herein to the plaintiff. The plaintiff shall transfer to the defendant all her right, title and interest in all of these assets. The defendant shall hold the plaintiff harmless from any liability from the date of transfer.
9. Each party shall be liable for the debts listed in his or her financial affidavit.
10. The defendant shall provide COBRA medical benefits for the plaintiff at her expense for three (3) years or until she obtains such insurance from her employment or otherwise, whichever first occurs.
11. The defendant shall indemnify the plaintiff for any and all liability for taxes and any interest or penalties due thereon resulting from the filing of any tax returns by the defendant or the defendant and the plaintiff jointly through 1991.
12. The parties shall divide the contents of the marital home. If they are unable to agree on any or all items, they shall refer the matter to family relations for resolution and the court shall retain jurisdiction over the matter until this issue is settled.
13. The fees of counsel for the minor child shall be shared equally by the parties and payment shall be made no later than sixty (60) days from the date of judgment.
14. Given the distribution of the assets, the court will order the parties to pay their own counsel fees and expenses.
15. The defendant shall arrange to transfer to the plaintiff the car she has been driving, said transfer to take place within three (3) weeks following the date of judgment, and the plaintiff shall be responsible for any future liability for its use or for any loan payment.
16. A conditional wage execution order shall issue.
17. The current pendente lite orders shall remain in effect until the entry of this judgment in accordance with the stipulation dated June 16, 1992 and approved by and filed with the court. CT Page 10961
It is so ordered.
MARGARET C. DRISCOLL, JUDGE REFEREE